Filed 12/12/14  In re M.M. CA1/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION ONE

|  |  |
|---|---|
| In re M.M., a Person Coming Under the Juvenile Court Law. | |
| SONOMA COUNTY HUMAN SERVICES DEPARTMENT,<br><br>        Plaintiff and Respondent,<br><br>v.<br><br>L.M.,<br><br>        Defendant and Appellant. | A141184<br><br>(Sonoma County<br>Super. Ct. No. 3782-DEP) |

L.M. (Mother) appeals from an order terminating her parental rights with respect to her five-year-old daughter, M.M.  Mother contends the trial court misconstrued her burden of proving the termination of her rights would be detrimental to M.M. under the beneficial relationship exception.  We disagree, and affirm the judgment.

## I.  BACKGROUND

The three children of Mother, M.M., then age 23 months, and her twin brothers, then both one month old, were the subject of a November 2011 dependency petition.  The petition alleged neglect, failure to protect, and failure to support due to serious domestic violence between Mother and her husband, the minors' presumed father (Father), and substance abuse by Father and Mother.  The minors were found to be dependents of the court in December 2011.

Reunification services were granted to Mother, but denied to Father as a result of his history of chronic substance abuse. (Welf. & Inst. Code,[1] § 361.5, subd. (b)(13).) At the time of the six-month review in June 2012, the Sonoma County Human Services Department (Agency) recommended terminating reunification services to Mother as a result of her continued contact with Father, erratic compliance with a substance abuse program, and inability to accept responsibility for her conduct. The Agency had placed M.M. in the home of her maternal great-aunt and uncle. After a contested six-month review hearing in September 2012, the juvenile court granted Mother an additional six months of services.

At the time of the 12-month hearing in December 2012, the Agency recommended M.M. remain in her current foster home and again recommended termination of Mother's reunification services. After a series of evidentiary hearings, the court terminated her services and scheduled a permanency planning hearing pursuant to section 366.26. At the final hearing, Mother made an oral request for a bonding study between her and M.M. so she could show there was a beneficial relationship between them. After the court denied the request on procedural grounds, Mother filed a posthearing written request for such a bonding study, which the court also denied.

In separate proceedings, this court (1) denied Mother's petition for extraordinary writ directing the juvenile court to restore reunification services (*L.T. v. Superior Court* (Aug. 9, 2013, A138652) [nonpub. opn.]) and (2) affirmed the denial of her bonding study request (*In re M.M.* (May 20, 2014, A139681) [nonpub. opn.]).

The Agency filed its permanent plan report in August 2013. The social worker found M.M. to be "a bright, engaging girl with a beautiful smile" who was "playful, affectionate and kind." At her most recent assessment, she was found to be developmentally on target with no additional services needed. She had forged a close relationship and bond with both her maternal great-uncle and aunt, who had been identified as her prospective adoptive parents since May 27, 2012. The social worker

---

[1] All further statutory references are to the Welfare and Institutions Code.

found M.M. to be "a confident, affectionate, and happy child" in her caregivers' home, and reported her foster parents "provided a secure, nurturing environment with ample opportunities for growth and development." The caregivers had an approved home study and were committed to M.M. and expressed a desire to adopt her. The social worker believed it was likely M.M. would be adopted, and recommended the termination of parental rights and selection of adoption as the permanent plan.

The court held the permanent plan hearing in December 2013. The social worker, who qualified as an expert in social work and attachment, testified M.M. would suffer no detriment if parental rights were terminated. She stated M.M. had a secure attachment with her foster parents. She believed M.M. was likely to be adopted. The social worker acknowledged M.M. had medical problems,[2] but believed they were minor and would not interfere with the child's adoptability.

The social worker testified Mother was patient and calm during the visits and set good boundaries. She observed Mother consistently gave M.M. more attention than the twins, which was a negative in her view. She also admitted M.M.'s attachment to Mother when she was younger could have made it easier for her to attach to her prospective adoptive parents. She had seen M.M. resist when it came time to end visits with Mother, but believed she "was just being independent and having her say," rather than having difficulty in separating from Mother.

At the conclusion of this testimony, county counsel asked the court to find M.M. to be adoptable. Following argument on this issue, the court agreed M.M. was both generally and specifically adoptable.

The court proceeded to hear Mother's evidence concerning whether any exception to adoption existed. Mother's parenting educator testified about what she had witnessed during visits. She was able to see M.M. interact with Mother. Mother "definitely was responsive to the skills and strategies [she had been shown in parent education] in

---

[2] M.M. had been diagnosed with febrile seizures, hearing loss, contact dermatitis, and scoliosis, as well as an abnormal gait requiring braces to be placed in her shoes.

providing the parenting role." At the beginning of the visits, M.M. was excited to see Mother. She would regularly run to Mother, smiling and happy. The parenting educator could see there was affection when M.M. visited with Mother. At the end of the visits, there were times when the exit was delayed because mother and child were enjoying their time together.

The visitation monitor testified she had seen M.M. run to Mother at the beginning of the visits and give her kisses during the visit. During the visits there were a couple of times when M.M. struggled a little bit at first to get away when Mother tried to hold her in her lap. She found that unusual in her experience with mothers and children. She also did not think M.M. was emotional when it came time to leave the visits. She thought any delay in ending the visits was because M.M. wanted to continue playing with the toys. At the same time, the visitation monitor believed M.M. sought out and thrived on Mother's attention.

Finally, Mother testified she had been M.M.'s primary caretaker for the first two years of the child's life. "We went home and. . . we spent every moment together. She was never babysat." Mother had also secured services for M.M.'s hearing problem. She would read to M.M., sing to her, and teach her songs. She described M.M. before her detention as being "[e]xtremely attached [to her], like heartbreakingly so." At the end of the very first visit after detention, M.M. was screaming for Mother. Even after more than a year in foster care, M.M. continued to say she did not want to leave at the end of the visits. She told Mother she wanted to go home with her. Mother felt she occupied a parental role in the child's life.

Mother testified M.M. became clingy at the end of visits. She had become increasingly "more resistant to leaving." Based on how upset M.M. would seem at the end of their visits, Mother worried that if her parental rights were terminated, M.M. would suffer a great loss.

County counsel argued in closing that Mother had not met any of the exceptions to adoption, and asked the court to terminate parental rights so M.M's caregivers could adopt her. Minor's counsel joined in supporting the Agency's recommendations.

4

Mother's counsel, on the other hand, argued M.M. had a healthy and strong attachment with Mother. He asked the court not to terminate parental rights and to select guardianship as the permanent plan to preserve the bond M.M. shared with Mother.

Following argument, the court reiterated it found M.M. to be adoptable by clear and convincing evidence. The court stated the burden then shifted to Mother to prove the benefit of adoption was overcome by the beneficial relationship between her and M.M.

The court found Mother had met the first prong of the test for a beneficial relationship exception by consistently visiting the child. The court noted the exception also required Mother to occupy a parental role, not just that of a visitor. The court then made the following statement: "[W]hile there's been some evidence of that, the Court notes in reviewing the law, and the case law, that an exception here *requires exceptional circumstances*. Adoption is the norm. And the parent-child relationship must be of such strength and quality as to overcome the security that adoption serves. *The standard is a high one*." (Italics added.) The court went on to say California law "mandates that the parent-child relationship, to sever that would create such a substantial harm to the child that *the detriment is clear*." (Italics added.) It found Mother had "not established that." The court stated: "The parent has a *significant burden* in the sense that that is a legal requirement to overcome the legislative preference for adoption. The evidence here shows that there is a relationship, but that relationship does not overcome the preference for adoption. The benefits for adoption outweigh, in this case, the benefits of maintaining a parental relationship or exploring other permanent plans." (Italics added.) The court adopted and signed the Agency's recommended findings and orders. The court found by clear and convincing evidence it was likely M.M. would be adopted and that termination of parental rights would not be detrimental to her. The court ordered termination of Mother's and Father's parental rights and selected adoption as the permanent plan for M.M. Mother timely appealed.

## II. DISCUSSION

Mother contends the trial court abused its discretion by applying an incorrect, elevated standard of proof to determine whether she had met her burden of demonstrating

the termination of her parental rights would be detrimental to M.M under the beneficial relationship exception found in section 366.26, subdivision (c)(1)(B)(i).  Her argument focuses on the trial court's use of certain specific phrases—"exceptional circumstances," "clear [detriment]," "standard is a high one," and "significant burden"—that do not appear in the statute.

**A.  *Applicable Law***

"Section 366.26 provides that if parents have failed to reunify with an adoptable child, the juvenile court must terminate their parental rights and select adoption as the permanent plan for the child.  The juvenile court may choose a different permanent plan only if it 'finds a compelling reason for determining that termination [of parental rights] would be detrimental to the child [because]: [¶] (i) The parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship.'  (§ 366.26, subd. (c)(1)(B)(i).) . . . [¶] . . . A beneficial relationship 'is one that "promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." ' "  (*In re Marcelo B.* (2012) 209 Cal.App.4th 635, 642–643.)

Proving the second prong thus involves a balancing test:  "[T]he court balances the strength and quality of the natural parent/child relationship . . . against the security and the sense of belonging a new family would confer.  If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated."  (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)  *Autumn H.* states the benefit from continuing the interaction must be of exceptional importance to the child:  "Interaction between natural parent and child will always confer some incidental benefit to the child. . . . The exception applies only where the court finds regular visits and contact have continued or developed a significant, positive, emotional attachment from child to parent."  (*Ibid*.)  Some cases have described *Autumn H.* as imposing a "heavy" burden to establish the beneficial relationship exception.  (See *In re C.F.* (2011) 193 Cal.App.4th 549, 558.)  *Autumn H.*'s formulation

6

of the beneficial relationship standard has been " 'widely followed by the Courts of Appeal.' " (*In re S.B.* (2008) 164 Cal.App.4th 289, 297, quoting *In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1347.)

The case law instructs the trial courts to evaluate the beneficial relationship exception in light of the Legislature's clearly stated preference for adoption: "The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.] . . . The . . . exceptions merely permit the court, *in exceptional circumstances* [citation], to choose an option other than the norm, which remains adoption." (*In re Celine R.* (2003) 31 Cal.4th 45, 53, italics added; accord *In re Scott B.* (2010) 188 Cal.App.4th 452, 469 ["Because a parent's claim to [the beneficial relationship exception] is evaluated in light of the Legislature's preference for adoption, it is only in exceptional circumstances that a court will choose a permanent plan other than adoption."].)

The party claiming an exception to adoption has the burden of proof to establish by a preponderance of evidence that the exception applies. (*In re Rachel M.* (2003) 113 Cal.App.4th 1289, 1295.) There is some difference of opinion regarding the applicable standard in reviewing a juvenile court's finding on the beneficial parental relationship exception, with courts applying either the substantial evidence or abuse of discretion standard, or a combination. (See *In re K.P.* (2012) 203 Cal.App.4th 614, 621–622.) There is little practical difference between these standards in most circumstances. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314–1315 (*Bailey J.*).)

For purposes of this appeal, we will assume, as Mother proposes, that a mixed standard of review applies to a trial court's findings on the beneficial relationship exception. Factual findings a parent did not regularly visit the child, or the child would not benefit from maintaining that parental relationship, may only be reversed on appeal if they are contradicted by undisputed facts. (See *Bailey J., supra*, 189 Cal.App.4th at p. 1314.) On the other hand, the ultimate question of whether that parental bond, if it exists, was significant enough to outweigh the benefits of adoption is subject to an abuse

7

of discretion standard.  (*Id.* at p. 1315.)  Under that standard, it is an abuse of discretion to apply a standard of proof greater than preponderance of the evidence.  (See *In re Shannon M.* (2013) 221 Cal.App.4th 282, 289 [a court abuses its discretion when it applies incorrect legal standards].)  On appeal, it is Mother's burden to demonstrate the trial court abused its discretion in this manner.  (See *In re Casey D.* (1999) 70 Cal.App.4th 38, 47.)

**B.** *Analysis*

We are not persuaded the trial court applied an incorrect standard of proof.  The court's statement that "an exception here requires exceptional circumstances" simply reiterates the understanding and description of statutory intent found in Supreme Court and appellate court authority cited above— *In re Celine R.* and *In re Scott B.*  (See also *In re G.B.* (2014) 227 Cal.App.4th 1147, 1165–1166 [only in an "extraordinary" case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement at section 366.26 hearing].)  The court here was simply acknowledging case law construction of section 366.26 that adoption is to be treated as the norm after reunification services have ended, and an exception to adoption requires proof of exceptional circumstances.

The other statements Mother points to also echo the case law.  The court stated, "The standard is a high one," in reference to the strength and quality of the parent-child relationship that will overcome the preference for adoption.  Perhaps inartfully, this phrasing simply restates *Autumn H.*'s point—a parent seeking to invoke the beneficial relationship exception must show something going well beyond the typical benefit interactions between a child and her natural parent "always confer."  (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)  The same point is expressed in equivalent fashion elsewhere in the case law.  The benefit to the child must be " ' "to such a degree" ' " that it outweighs the well-being gained in a permanent home with adoptive parents.  (*In re Marcelo B., supra,* 209 Cal.App.4th at p. 643, quoting *Autumn H.*)  The parent has a "heavy burden" under *Autumn H.* to establish the strength of the parent-child relationship is sufficient to outweigh the benefits of adoption.  (*In re C.F., supra*, 193 Cal.App.4th at

8

p. 558; see *In re Daniel H.* (2002) 99 Cal.App.4th 804, 813 [similar language of sibling relationship exception creates "heavy" burden].) The court's statements that (1) the detriment to the child from severing the parent-child relationship must be "clear," and (2) the parent bears a "significant burden" to overcome the legislative preference for adoption, similarly just paraphrase *Autumn H.* and other cases construing the exceptions to adoption under section 366.26. The court's use of these words in no way demonstrates it misconstrued Mother's burden of proof.

We find no evidence in the record Mother's relationship with M.M. promoted her well-being to such a degree that it outweighed the benefits she would gain in a permanent, adoptive home. The social worker, who qualified as an expert in attachment, testified M.M. would not suffer any substantial detriment in being separated from Mother. She had not observed M.M. to have any difficulty separating from Mother at the end of visits. At the same time, M.M. had forged a close relationship and bond with her prospective adoptive parents, who provided her a secure, nurturing environment in which she was thriving and her medical issues were being addressed. While there was friendliness and affection in Mother's visits with M.M., the trial court was not required to accept the rosy portrait Mother drew of M.M.'s life in her care before detention, or her characterization of the strength of their bond. We find no error or abuse of discretion in the trial court's determination that M.M.'s bond with Mother was not significant or exceptional enough to outweigh the benefits of adoption.

### III. DISPOSITION

The trial court's order terminating parental rights and selecting adoption as M.M.'s permanent plan is affirmed.

_____
Margulies, Acting P.J.

We concur:


_____
Dondero, J.


_____
Banke, J.